**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO; AMERICAN FEDERATION OF STATE, COUNTY & MUNICIPAL EMPLOYEES, AFL-CIO; SERVICE EMPLOYEES INTERNATIONAL UNION; AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES - LOCAL 1122; AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES - LOCAL 1236; AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES - LOCAL 2110; AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES - LOCAL 3172; SERVICE EMPLOYEES INTERNATIONAL UNION - LOCAL 1000; ALLIANCE FOR RETIRED AMERICANS; AMERICAN GEOPHYSICAL UNION; AMERICAN PUBLIC HEALTH ASSOCIATION; CENTER FOR TAXPAYER RIGHTS; COALITION TO PROTECT AMERICA'S NATIONAL PARKS; COMMON | No. 25-3293<br><br>D.C. No.<br>3:25-cv-03698-SI<br>Northern District of California,<br>San Francisco<br><br>ORDER |

DEFENSE CIVIC ENGAGEMENT;
MAIN STREET ALLIANCE;
NATURAL RESOURCES
DEFENSE COUNCIL, INC.;
NORTHEAST ORGANIC
FARMING ASSOCIATION, INC.;
VOTEVETS ACTION FUND, INC.;
WESTERN WATERSHEDS
PROJECT; COUNTY OF SANTA
CLARA; CITY OF CHICAGO;
COUNTY OF KING; COUNTY OF
HARRIS; CITY OF BALTIMORE;
CITY AND COUNTY OF SAN
FRANCISCO,

*Plaintiffs - Appellees*,

v.

DONALD J. TRUMP, in his official
capacity as President of the United
States; UNITED STATES OFFICE
OF MANAGEMENT AND
BUDGET; RUSSELL VOUGHT, in
his official capacity as Director of
U.S. Office of Management and
Budget; UNITED STATES OFFICE
OF PERSONNEL MANAGEMENT;
CHARLES EZELL, in his official
capacity as Acting Director of the
U.S. Office of Personnel
Management; UNITED STATES
DEPARTMENT OF

GOVERNMENT EFFICIENCY; ELON MUSK, in his official capacity as the actual head of the Department of Government Efficiency; AMY GLEASON, in her official capacity as the titular Acting Administrator of the Department of Government Efficiency; UNITED STATES DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS, in her official capacity as Secretary of the U.S. Department of Agriculture; UNITED STATES DEPARTMENT OF COMMERCE; HOWARD LUTNICK, in his official capacity as Secretary of the U.S. Department of Commerce; UNITED STATES DEPARTMENT OF DEFENSE; PETER HEGSETH, in his official capacity as Secretary of the U.S. Department of Defense; UNITED STATES DEPARTMENT OF ENERGY; CHRIS WRIGHT, in his official capacity as Secretary of the U.S. Department of Energy; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, Jr., in his official capacity as Secretary of the U.S. Department of Health and Human Services; UNITED STATES DEPARTMENT OF HOMELAND

SECURITY; KRISTI NOEM, in her official capacity as Secretary of the U.S. Department of Homeland Security; UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT TURNER, in his official capacity as Secretary of the U.S. Department of Housing and Urban Development; DOJ - UNITED STATES DEPARTMENT OF JUSTICE; PAMELA BONDI, Attorney General, in her official capacity as Attorney General of the U.S. Department of Justice; UNITED STATES DEPARTMENT OF THE INTERIOR; DOUG BURGUM, in his official capacity as Secretary of the U.S. Department of the Interior; UNITED STATES DEPARTMENT OF LABOR; LORI CHAVEZ-DEREMER, in her official capacity as Secretary of the U.S. Department of Labor; UNITED STATES DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity as Secretary of the U.S. Department of State; UNITED STATES DEPARTMENT OF THE TREASURY; SCOTT BESSENT, in his official capacity as Secretary of U.S. Department of Treasury; UNITED STATES DEPARTMENT

OF TRANSPORTATION; SEAN DUFFY, in his official capacity as Secretary for the U.S. Department of Transportation; UNITED STATES DEPARTMENT OF VETERANS AFFAIRS; DOUG COLLINS, in his official capacity as Secretary of Veterans Affairs; AMERICORPS; JENNIFER BASTRESS TAHMASEBI, in her official capacity as Interim Agency Head of AmeriCorps; UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; LEE ZELDIN, in his official capacity as Administrator of U.S. Environmental Protection Agency; UNITED STATES GENERAL SERVICES ADMINISTRATION; STEPHEN EHIKIAN, in his official capacity as Acting Administrator for U.S. General Services Administration; NATIONAL LABOR RELATIONS BOARD; MARVIN E. KAPLAN, in his official capacity as Chairman of the National Labor Relations Board; WILLIAM COWEN, in his official capacity as the Acting General Counsel of the National Labor Relations Board; NATIONAL SCIENCE FOUNDATION; BRIAN STONE, in his official capacity as Acting Director of the National

Science Foundation; UNITED STATES SMALL BUSINESS ADMINISTRATION; KELLY LOEFFLER, in her official capacity as Administrator of the U.S. Small Business Administration; SOCIAL SECURITY ADMINISTRATION; FRANK BISIGNANO, Commissioner of Social Security, in his official capacity as Commissioner of the U.S. Social Security Administration,

*Defendants - Appellants*.

IN Re DONALD J. TRUMP

DONALD J. TRUMP; UNITED STATES OFFICE OF MANAGEMENT AND BUDGET; RUSSELL VOUGHT; UNITED STATES OFFICE OF PERSONNEL MANAGEMENT; CHARLES EZELL; UNITED STATES DEPARTMENT OF GOVERNMENT EFFICIENCY; ELON MUSK; AMY GLEASON; UNITED STATES DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS; UNITED STATES DEPARTMENT OF COMMERCE;

No. 25-4476

D.C. No.
3:25-cv-03698-SI
Northern District
of California,
San Francisco

ORDER

HOWARD LUTNICK; UNITED STATES DEPARTMENT OF DEFENSE; PETER HEGSETH; UNITED STATES DEPARTMENT OF ENERGY; CHRIS WRIGHT; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, Jr.; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM; UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT TURNER; DOJ - UNITED STATES DEPARTMENT OF JUSTICE; PAMELA BONDI, Attorney General; UNITED STATES DEPARTMENT OF THE INTERIOR; DOUG BURGUM; UNITED STATES DEPARTMENT OF LABOR; LORI CHAVEZ-DEREMER; UNITED STATES DEPARTMENT OF STATE; MARCO RUBIO; UNITED STATES DEPARTMENT OF THE TREASURY; SCOTT BESSENT; UNITED STATES DEPARTMENT OF TRANSPORTATION; SEAN DUFFY; UNITED STATES DEPARTMENT OF VETERANS AFFAIRS; DOUG COLLINS; AMERICORPS; JENNIFER

BASTRESS TAHMASEBI;
UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY; LEE ZELDIN; UNITED
STATES GENERAL SERVICES
ADMINISTRATION; STEPHEN
EHIKIAN; NATIONAL LABOR
RELATIONS BOARD; MARVIN E.
KAPLAN; WILLIAM COWEN;
NATIONAL SCIENCE
FOUNDATION; BRIAN STONE;
UNITED STATES SMALL
BUSINESS ADMINISTRATION;
KELLY LOEFFLER; SOCIAL
SECURITY ADMINISTRATION;
FRANK BISIGNANO,
Commissioner of Social Security,

*Petitioners*,

v.

UNITED STATES DISTRICT
COURT FOR THE NORTHERN
DISTRICT OF CALIFORNIA, SAN
FRANCISCO,

*Respondent*,

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES,
AFL-CIO; AMERICAN
FEDERATION OF STATE,

COUNTY & MUNICIPAL EMPLOYEES, AFL-CIO; SERVICE EMPLOYEES INTERNATIONAL UNION; AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES - LOCAL 1122; AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES - LOCAL 1236; AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES - LOCAL 2110; AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES - LOCAL 3172; SERVICE EMPLOYEES INTERNATIONAL UNION - LOCAL 1000; ALLIANCE FOR RETIRED AMERICANS; AMERICAN GEOPHYSICAL UNION; AMERICAN PUBLIC HEALTH ASSOCIATION; CENTER FOR TAXPAYER RIGHTS; COALITION TO PROTECT AMERICA'S NATIONAL PARKS; COMMON DEFENSE CIVIC ENGAGEMENT; MAIN STREET ALLIANCE; NATURAL RESOURCES DEFENSE COUNCIL, INC.; NORTHEAST ORGANIC FARMING ASSOCIATION, INC.; VOTEVETS ACTION FUND, INC.; WESTERN WATERSHEDS PROJECT; COUNTY OF SANTA

CLARA; CITY OF CHICAGO; COUNTY OF MARTIN LUTHER KING, JR.; COUNTY OF HARRIS; CITY OF BALTIMORE; CITY AND COUNTY OF SAN FRANCISCO,

*Real Parties in Interest*.

Filed January 5, 2026

Before: William A. Fletcher, Johnnie B. Rawlinson, Circuit Judges.[*]

Order;
Statement by Judge W. Fletcher;
Dissent by Judge Bumatay

## SUMMARY[**]

### Executive Orders/Mandamus

In a case in which the American Federation of Government Employees, AFL–CIO and others challenge President Trump's Executive Order 14210 directing federal agencies to commence large-scale reductions in force

---

[*] Judge Ikuta was a member of the original panel in this case. In accordance with General Order 3.2(h), this order is issued by the remaining panel members as a quorum pursuant to 28 U.S.C. § 46(d).

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

("RIFs"), the panel denied a petition for panel rehearing or en banc rehearing of the panel's decision (1) denying the government parties' petition for a writ of mandamus challenging the district court's discovery order requiring in camera production of the Agency RIF and Reorganization Plans of all named agency defendants, (2) vacating the district court's preliminary injunction, and (3) remanding to the district court.

Respecting the denial of rehearing en banc, Judge W. Fletcher and Judge Rawlinson responded to the dissent from the denial of rehearing en banc.  First, although the Supreme Court had stayed the district court's preliminary injunction in an earlier iteration of this case, the Court specifically left open the legality of the documents at issue.  Second, the panel assumed that the privilege for predecisional deliberative documents applied to the Agency RIF and Reorganization Plans in question but agreed with the district court's conclusion that the privilege was overridden in the circumstances of this case.  Third, the panel carefully considered the well-established four-factor test set forth in *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156 (9th Cir. 1984), in determining that the deliberative process privilege was overcome and that mandamus was not warranted.  Fourth, the strong showing of a bad faith required for discovery of documents outside the administrative record was irrelevant because in this case there was no administrative record.  Finally, the dissent fails to adequately account for the exceptional standard for granting mandamus.

Dissenting from the denial of rehearing en banc, Judge Bumatay, joined by Judges Callahan, R. Nelson, VanDyke and Tung, wrote that, in denying the mandamus petition, the panel made three errors that needed correction by our en

banc court.  First, the panel majority flirted with the idea that the government's internal RIF Plans were not even deliberative—a truly extreme position.  It wrongly suggested that the government's internal RIF Plans are not predecisional, deliberative materials.  Second, and more importantly, the panel majority severely weakened the deliberative process privilege—a doctrine with deep common-law roots that protects the separation of powers.  It failed to adequately address the separation-of-powers concerns in ordering the discovery of intra-executive branch documents. Third, the panel majority created a blueprint for making an end-run around the Administrative Procedure Act's normal discovery rules.  It mangled the law for ordering extra-record discovery and so expanded it to circumvent any limits on the production of internal government documents.

---

**ORDER**

Judges W. Fletcher and Rawlinson voted to deny petitioners' petition for panel rehearing.  Judge Rawlinson voted to deny the petition for rehearing en banc, and Judge W. Fletcher so recommended.

The full court has been advised of the petition for rehearing en banc.  A judge requested a vote on whether to rehear the matter en banc.  The matter failed to receive a majority of votes of the nonrecused active judges in favor of en banc consideration.  Fed. R. App. P. 35(f).

The petition for panel rehearing or rehearing en banc (Dkt. No. 29) is **DENIED**.

W. FLETCHER and RAWLINSON, Circuit Judges, respecting the denial of rehearing en banc:

Our published order speaks for itself. *AFGE v. Trump*, 155 F.4th 1082 (9th Cir. 2025). However, some of the arguments in our colleague's dissent from failure to go en banc deserve additional response.

First, our colleague points out that the Supreme Court stayed the district court's preliminary injunction in an earlier iteration of this case. He writes that the Court "stayed the preliminary injunction, specifically concluding that 'the Government [was] likely to succeed on its argument that the Executive Order and [OMB-OPM] Memorandum are lawful[.]'" Dissent at 19 (alterations in original) (quoting *Trump v. AFGE*, 145 S. Ct. 2635, 2635 (2025)). Our colleague omits to mention that the Court specifically left open the legality of the documents at issue in the petition before us. We wrote in our order that the Court "expressly declined to express any view on 'the legality of any Agency RIF and Reorganization Plan [ARRP] produced or approved pursuant to the Executive Order and Memorandum.'" *AFGE*, 155 F.4th at 1089 (quoting *AFGE*, 145 S. Ct. at 2635). As Justice Sotomayor noted in concurrence, the Supreme Court's stay "leaves the District Court free to consider those questions in the first instance." 145 S. Ct. at 2635 (Sotomayor, J., concurring). The question before our panel was a necessary preliminary: whether the district court could look at the ARRPs in determining their legality. The answer to that question is pretty obviously "yes."

Second, our colleague's first argument, occupying five manuscript pages, pushes on an open door. Dissent at 23–27. Our colleague argues that the ARRPs in question were privileged predecisional, deliberative documents. There is

good reason to conclude that they are not.  It is hard to argue that the ARRPs are predecisional when "extensive reorganizations and RIFs [were] already underway." *AFGE*, 155 F.4th at 1091.  "[I]f the ARRPs are non-final planning documents that do not commit an agency to take any specific action, pursuant to *what*, then, are the agencies implementing their large-scale reorganizations and RIFs?" *Id.* (quoting Dist. Ct. Dkt. No. 214 at 10).  Likewise, it is hard to argue that the ARRPs are deliberative when "all available evidence . . . indicates that the ARRPs represent the considered position of the agency submitted for approval by OMB, and not the personal opinions of an individual." *Id.* at 1092.

We nevertheless assumed in our order that the privilege for predecisional, deliberative documents applies.  We wrote:

> [W]e are willing to assume arguendo, as did the district court, that at least some of the ARRPs are predecisional deliberative documents and that the privilege therefore applies.

*Id.*  "So assuming, we agree with the district court's conclusion that the privilege is overridden in the circumstances of this case."  *Id.*

Third, the government argued to us that the deliberative process privilege was not overcome and that mandamus was warranted, relying on our well-established four-factor *Warner* test.  *See FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984); Petition for Writ of Mandamus at 11.  Our order carefully considered the four *Warner* factors and concluded that the privilege was overcome and

that mandamus was not warranted. *AFGE*, 155 F.4th at 1092–93. In disagreeing with our conclusion, our colleague nowhere addresses the four-factor *Warner* test. Instead, he relies on *Department of Commerce v. New York*, 588 U.S. 752 (2019), which the government never relied on—or even mentioned—in its briefing to us.

Fourth, quoting *Department of Commerce*, our colleague contends that discovery of the RIFs required "a strong showing of bad faith or improper behavior." Dissent at 30, 32. Here is the paragraph from which that language is taken:

> [W]e have recognized a narrow exception to the general rule against inquiring into "the mental processes of administrative decisionmakers." On a "strong showing of bad faith or improper behavior," such an inquiry may be warranted and may justify *extra-record discovery*.

*Dep't of Com.*, 588 U.S. at 781 (emphasis added) (citations omitted). As the Court's opinion makes clear, *Department of Commerce* and its narrow exception address documents that are outside the administrative record. Our colleague overlooks the fact that the government successfully opposed producing an administrative record in the district court. *See* Dist. Ct. Dkt. Nos. 240, 242. The posture of this case thus makes *Department of Commerce* irrelevant, for there is no administrative record.

As we wrote in our order:

> [T]his case does not come to us in the posture of an ordinary APA review. *There has been no compilation of a conventional*

> *administrative record*, no notice-and-comment rulemaking, and no issuance of a final rule or adjudication.  Instead, *massive RIFs and reorganizations have been carried out without anything resembling the normal rulemaking or adjudicatory processes that typically produce a conventional administrative record. . . .* If there have been "departures from settled principles" in this case, they consist in the sweep of actions undertaken by the government without ordinary processes—actions which the government now seeks to shield from scrutiny by invoking presumptions ordinarily attendant upon the very processes it has ignored.

*AFGE*, 155 F.4th at 1093 (emphasis added) (citation omitted).

Finally, our colleague fails to adequately account for the exceptional standard for granting mandamus.  Mandamus is a "drastic and extraordinary remedy reserved for really extraordinary causes."  *In re Bundy*, 840 F.3d 1034, 1040 (9th Cir. 2016) (quoting *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 380 (2004)).  Absence of "clear error" is dispositive and fatal to a mandamus petition.  *Id.* at 1041.  "The clear error standard is significantly deferential and is not met unless the reviewing court is left with a 'definite and firm conviction that a mistake has been committed.'"  *Id.* (quoting *In re United States*, 791 F.3d 945, 955 (9th Cir. 2015)).  The government agreed that *Warner* supplies the governing test for overcoming the asserted privilege, and the district court faithfully applied it.  There was no error in the district court's

application of *Warner*, which our colleague's dissent does not address. We denied mandamus—and this court appropriately denied en banc rehearing—because the clear error standard was not met.

BUMATAY, Circuit Judge, joined by CALLAHAN, NELSON, VANDYKE, and TUNG, Circuit Judges, dissenting from the denial of rehearing en banc:

> The majority today does not acknowledge the district court's clear error in ordering the production of documents that implicate the executive branch's deliberative processes, even though producing such intra-executive branch dialogues implicates separation of process concerns that require the most 'careful consideration' by the judiciary.

*American Federation of Government Employees, AFL-CIO v. Trump* (*"AFGE"*), 155 F.4th 1082, 1095 (9th Cir. 2025) (Ikuta, J., dissenting) (simplified).

## I.

This controversy began with a Sharpie.

Shortly after taking office, President Trump signed Executive Order 14210. In that Order, the President directed agency heads to "undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law[.]" Executive Order No. 14210, 90 Fed. Reg. 9669, 9670 (Feb. 14, 2025). Following the Executive Order, the Office of Management and Budget ("OMB") and the Office of Personnel Management ("OPM") issued a guidance

directing executive agencies to submit agency RIF and reorganization plans ("RIF Plans") for review and approval. The two agencies required the RIF Plans to be submitted in two phases. First, Phase 1 RIF Plans were to focus on "initial agency cuts and reductions," detailing which agency components and agencies perform work not mandated by statute. Second, Phase 2 RIF Plans were to provide a plan for "more productive, efficient agency operations," including explaining how the RIF Plans "will improve services for Americans and advance the President's policy priorities." Nothing in the Executive Order or the follow-up guidance forces agencies to implement RIFs according to the internal RIF Plans. The American Federation of Government Employees, other federal-employee unions, advocacy organizations, and local governments (collectively, "Plaintiffs") immediately sued to stop the RIFs, bringing Administrative Procedure Act ("APA") and ultra vires claims.

The Ninth Circuit has mishandled this case from the start. The first misstep? Weeks after the complaint's filing, the district court ruled that the President was without authority to direct executive agencies to even *plan* for RIFs and enjoined "any actions" directed by the President's Executive Order and the OMB/OPM guidance. The district court believed only agencies—acting independent of the President—could consider implementing RIFs. Of course, this ignores that only the President is vested with the Executive Power. *See* U.S. Const. art. II, § 1 ("The executive Power shall be vested in a President of the United States of America."). This was "a sweeping preliminary injunction that strip[ped] the Executive of control over its own personnel." *See AFGE v. Trump*, 139 F.4th 1020, 1040 (9th Cir. 2025) (Callahan, J., dissenting). Ignoring this huge

constitutional pitfall, a divided motions panel of the Ninth Circuit then refused to stay the preliminary injunction. *Id.* The Supreme Court made swift work of our poor judgment. It stayed the preliminary injunction, specifically concluding that "the Government [was] likely to succeed on its argument that the Executive Order and [OMB-OPM] Memorandum are lawful[.]" *Trump v. AFGE*, 145 S. Ct. 2635, 2635 (2025). Sure, the Court didn't opine on each agency's individual RIF plan but it didn't bless wholesale judicial intervention in particular agency's RIFs either. That was our first mistake.

Now for the second misstep. Shortly after the complaint was filed, the district court ordered the government to immediately produce to Plaintiffs all versions of internal RIF Plans submitted to or approved by OMB and OPM. Perhaps realizing the scope of its decision, the district court backpedaled a bit. It paused its discovery order to consider the government's motion to reconsider. But, in July, even after the Supreme Court stayed the preliminary injunction, the district court continued to order the government to produce its internal RIF Plans to Plaintiffs' counsel (but you wouldn't learn that from reading the panel majority opinion). The only solace for the government? The district court granted a protective order preventing counsel from sharing the internal RIF plans.

Once again, we failed to fix this mistake. The government petitioned for a writ of mandamus, requesting that we direct the district court to halt the production of its intragovernmental documents. Over Judge Ikuta's dissent, the panel majority denied the petition. *AFGE*, 155 F.4th at 1093. This error, however, seriously degrades the separation of powers—opening the federal government's internal

deliberations to the whims of district courts opposed to presidential policies.

In denying the mandamus petition, the panel made three errors that needed correction by our en banc court.

First, the panel majority flirted with the idea that the government's internal RIF Plans were not even deliberative—a truly extreme position. The panel majority found "little evidence" to believe that the documents were deliberative. *AFGE*, 155 F.4th at 1091. It relied on an unbelievably narrow view of what's deliberative. It opined that a document *must* reflect some executive branch employee's "personal position" rather than an "agency position" to qualify as "deliberative." *Id.* (emphasis omitted). Because the government's internal RIF Plans appeared to "represent the considered position of the agency . . . and not the personal opinions of an individual," the panel majority suggested that the documents weren't entitled to any deliberative process protection. *Id.* at 1092. But that's contrary to precedent and any conception of the privilege. Now, the panel majority claims that its musing on this subject is no big deal because it ultimately *assumed* that the internal RIF Plans were "predecisional deliberative documents." *Id.* But not so fast. Given the Ninth Circuit's odd binding dicta rule, even the panel majority's outlier views may become precedential law. *See Enying Li v. Holder*, 738 F.3d 1160, 1164 n.2 (9th Cir. 2013). So we needed to correct this error.

Second, and more importantly, the panel majority severely weakened the deliberative process privilege—a doctrine with deep common-law roots that protects the separation of powers. *See* Russell L. Weaver & James T.R. Jones, *The Deliberative Process Privilege*, 54 Mo. L. Rev.

279, 283–90 (1989) (tracing the origins and early development of the deliberative process privilege). There's no question that the internal RIF Plans enjoy the protection of the deliberative process privilege. But the panel majority pierced that privilege by ignoring separation-of-powers concerns. Compelling disclosure of internal Executive Branch communications must be exceptional and appropriately narrow. After all, as Judge Ikuta observed, these are no "ordinary discovery matters." *AFGE*, 155 F.4th at 1099 (Ikuta, J., dissenting) (simplified). The panel majority doubted any "chilling effect on internal Executive Branch deliberations" simply because it believed that the *in camera* production of the government's internal RIF documents hadn't *yet* produced any "harm." *AFGE*, 155 F.4th at 1092–93. Again, that's too narrow a view of a separation-of-powers harm. Just because no immediate hazard materializes from showing internal documents to a judge in the privacy of the judge's chambers doesn't mean that no harm will come to the government from wider public disclosure. Even worse, the panel majority suggested that ordinary discovery rules don't even apply here because of what it deems "the sweep of actions undertaken by the government without ordinary processes." *Id.* at 1093. So the panel majority condoned departing from "settled principles" to combat what it perceived as the government's "massive RIFs and reorganizations" without "normal rulemaking or adjudicatory processes[.]" *Id.* But the rule of law requires that we maintain the accepted rules even if we believe others do not.

Third, the panel majority created a blueprint for making an end-run around the APA's normal discovery rules. Simply, "deliberative materials are not part of the administrative record to begin with." *Blue Mountains*

*Biodiversity Project v. Jeffries*, 99 F.4th 438, 445 (9th Cir. 2024) (simplified). Thus, under settled APA rules, the whole record is the "record the agency presents." *Id.* (simplified). As Judge Ikuta recognized, compelling extra-record discovery requires, at a minimum, putting plaintiffs to their burden of showing a "narrow exception" applied or a "strong showing of bad faith or improper behavior." *AFGE*, 155 F.4th at 1097–98 (Ikuta, J., dissenting) (simplified). But those limits were cast aside under the panel majority's ruling. According to the panel majority, merely saying the magic words of "ultra vires" gets plaintiffs around any limits on discovery in APA suits. *AFGE*, 155 F.4th at 1093 ("Review of an ultra vires challenge would not be limited to an administrative record."). Under the panel majority's new boundless ruling, plaintiffs may engage in fishing expeditions for any internal government documents so long as they add an "ultra vires" claim to their APA complaint.

So while this case began with a Sharpie, unless corrected, it ends with a blow to the separation of powers. The Supreme Court already had to step in once in this case. But we failed to police ourselves yet again. We should have taken this case en banc to correct the panel majority's "departures from settled principles." *Id.* at 1099 (Ikuta, J., dissenting). Because the separation of powers requires greater restraint than we have shown, I respectfully dissent from the denial of rehearing en banc.

## II.

Satisfying the threshold for mandamus is high—but not insurmountable. While we look at several factors in considering the petition, we start with whether the district court's order is clearly erroneous. *See In re Mersho*, 6 F.4th 891, 898 (9th Cir. 2021). Clear error exists when "the

reviewing court is left with a definite and firm conviction that a mistake has been committed." *In re Bundy*, 840 F.3d 1034, 1041 (9th Cir. 2016) (simplified).

Three errors infect the panel majority's consideration of the "clear error" factor. First, the panel majority wrongly suggested that the government's internal RIF Plans are not predecisional, deliberative materials. Second, it failed to adequately address the separation-of-powers concerns in ordering the discovery of intra-executive branch documents. Third, it mangled the law for ordering extra-record discovery and so expanded it to circumvent any limits on the production of internal government documents. Each of these errors warrants en banc review.

## A.

## Internal RIF Plans Are Predecisional, Deliberative Documents

In denying the mandamus petition, the panel majority cast doubt on whether the government's internal RIF Plans were predecisional, deliberative documents. *AFGE*, 155 F.4th at 1091. That suggestion is mistaken. And even though the panel majority ultimately assumed that the RIF Plans were subject to the deliberative process privilege, it's important to correct any misimpression on the nature of deliberative documents that the panel majority leaves as precedent.

The deliberative process privilege "permits the government to withhold documents" that are "predecisional" and "deliberative." *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984) (per curiam). A document is "predecisional" if it was "generated before the agency's final decision on the matter." *U.S Fish & Wildlife Serv. v. Sierra*

*Club, Inc.*, 592 U.S. 261, 268 (2021). And a document is "deliberative" if it is "prepared to help the agency formulate its position." *Id.* Classic examples of predecisional and deliberative documents include internal memoranda containing "advisory opinions, recommendations, and deliberations[.]" *Warner Commc'ns Inc.*, 742 F.2d at 1161 (simplified). Simply, the privilege protects documents that "compris[e] part of a process by which governmental decisions and policies are formulated." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975) (simplified).

The government's internal RIF Plans easily fit the requirements of a predecisional, deliberative document. Recall that the internal RIF Plans are infused with both policy recommendations and legal analyses to inform how to implement RIFs. For example, the OMB/OPM guidance requires the agencies to provide proposals on how to implement the President's broad policy goals, including recommendations—

> [T]o consolidate areas of the agency organization chart that are duplicative, consolidate management layers where unnecessary layers exist, seek reductions in components and positions that are non-critical, implement technological solutions that automate routine tasks while enabling staff to focus on higher-value activities, close and/or consolidate regional field offices to the extent consistent with efficient service

delivery, and maximally reduce the use of
outside consultants and contractors.

These agency advisory opinions, recommendations, and deliberations are textbook examples of predecisional, deliberative materials. The internal RIF Plans were also to contain detailed legal analysis. The agencies were to provide legal interpretations of their organic statutes and to assess whether those statutes have "been interpreted in a way that expands requirements beyond what the statute actually requires." The OMB/OPM directive thus sought the agencies' legal advice on what functions these statutes "explicitly require"—presumably with the eye of discontinuing non-mandated functions. So these documents were "generated before the agency's final decision on the matter" and "prepared to help the agency formulate its position," *Sierra Club*, 592 U.S. at 268, and were entitled to the privilege even if RIFs were later implemented.

First, the panel majority thought that these internal RIF Plans can't be predecisional because "about 40 RIFs in 17 agencies were in progress," and so the panel majority guessed that the agencies must be implementing *something*. *AFGE*, 155 F.4th at 1091. But we don't decide Executive Branch privileges based on guesses. The panel majority cited no evidence that the agencies were implementing RIFs according to the plans submitted to or approved by OMB and OPM. And the panel majority misunderstood OMB and OPM's role in implementing RIFs. They do not implement agency policies—the agencies do. *See, e.g.*, 5 U.S.C. § 3502. Indeed, nothing shows that agencies are bound to implement a RIF plan as "approved" by OMB and OPM. In fact, counterexamples abound. *See, e.g.*, Erin Schumaker et al., *Vought promised to use the shutdown to shutter the*

*bureaucracy.  It didn't go as planned.*, Politico (Oct. 25, 2025)[1] (reporting that the RIFs agencies are implementing differ from those outlined in agency plans and OMB guidance).  So even if the agencies eventually implemented a RIF, no evidence establishes that they acted "pursuant to" one of these internal RIF Plans, as the panel majority speculated.  *AFGE*, 155 F.4th at 1091.

Second, the panel majority viewed the internal RIF Plans as non-deliberative because they "represent the considered position of the agency submitted for approval by OMB, and not the personal opinions of an individual" within the government.  *Id.* at 1092.  As Judge Ikuta's dissent explained, the deliberative process privilege is not limited "to personal opinions" alone.  *See id.* at 1097 n.3 (Ikuta, J., dissenting).  The panel majority seemingly highlighted *one* category of clearly deliberative material, as discussed by the D.C. Circuit in *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980), and concluded it represented the exclusive universe of deliberative documents.  But the panel majority ignored the D.C. Circuit's warning that deciding whether a document is deliberative is complicated because of "the sheer variety of ways in which a document can be deliberative." *Jud. Watch, Inc. v. U.S. Dep't of Justice,* 20 F.4th 49, 55 (D.C. Cir. 2021).  The panel majority was thus wrong to reduce "deliberative" documents to only those expressing "personal views."

And it would be an extraordinary narrowing of the privilege—and contrary to precedent—to limit it to only federal employees' *personal* opinions.  Instead, the privilege applies to any document that is "prepared to help the agency

---

[1] https://www.politico.com/news/2025/10/25/hhs-shutdown-layoffs-doge-vought-00620786

formulate its position." *Sierra Club*, 592 U.S. at 268 (simplified). Indeed, the panel majority's newfound "personal opinion" requirement would effectively destroy any deliberative process privilege for any interagency communications. Often agencies communicate with one another in a predecisional, deliberative posture—with agencies conveying the agency's considered view of the subject. Under the panel majority's view, all those communications are discoverable because they would be the agency's view, not an employee's "personal view."

While the panel majority later assumed the deliberative process privilege applies, it's clear that its misunderstanding of the subject derailed its decision to pierce the privilege. I turn to that next.

## B.

### Deliberative Process Privilege Was Not Overcome

It's well-settled that we start from the premise that "[d]eliberative documents, which are prepared to aid the decision-maker in arriving at a decision, are ordinarily not relevant" to assess the lawfulness of agency actions. *Blue Mountains Biodiversity Project*, 99 F.4th at 445 (simplified). After all, the deliberative process privilege is no ordinary privilege. A subset of the executive privilege, it derives from the separation of powers and traces its roots to the very first presidential administration. Ignoring this background, the panel majority flipped any presumption of non-disclosure and sanctioned broad production of internal government documents on the flimsiest rationale.

## 1.

Though not formally coined until the twentieth century, the deliberative process privilege is a "form of executive

privilege." *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997); *see also Cong. Requests for Confidential Exec. Branch Info.*, 13 Op. O.L.C. 153, 154 (1989) (describing "deliberative process" as a "generally-recognized component[] of executive privilege"). Some trace the privilege to "the principles underlying the English 'crown privilege,'" which protected "a wide range of governmental communications," including "correspondence of or between government officials." Weaver & Jones, 54 Mo. L. Rev. at 283; *see also Kaiser Aluminum & Chem. Corp. v. United States*, 157 F. Supp. 939, 945 (Ct. Cl. 1958) (Reed, J., sitting by designation); *but see* Jonathan D. Shaub, *The Executive's Privilege*, 70 Duke L.J. 1, 15 (2020).

As a component of executive privilege, the deliberative process privilege has its roots in Founding-era practice. *Auth. of Agency Offs. to Prohibit Emps. from Providing Info. to Cong.*, 28 Op. O.L.C. 79, 83 (2004). For instance, President Washington asserted a privilege to withhold internal documents in response to a congressional investigation. *Id.* President Washington's Cabinet—composed of Thomas Jefferson, Alexander Hamilton, Edmund Randolph, and Henry Knox—all recognized the Executive's prerogative to withhold internal executive branch materials "the disclosure of which would injure the public." *Hist. of Refusals by Exec. Branch Offs. to Provide Info. Demanded by Cong.*, 6 Op. O.L.C. 751, 752 (1982). And James Madison, then serving in the House of Representatives, recognized "that the Executive had a right" "to withhold information, when of a nature that did not permit a disclosure of it at the time." *Id.* at 754 (quoting 5 Annals of Cong. 773 (1796)).

Later presidents similarly invoked a privilege to withhold certain intra-Executive Branch materials. Both

Thomas Jefferson and James Monroe invoked the privilege during their terms in office. *See* Shaub, 70 Duke L.J. at 74–76; Weaver & Jones, 54 Mo. L. Rev. at 284–85. So did Presidents Andrew Jackson and Abraham Lincoln. 6 Op. O.L.C. at 756–58, 765–66.

Executive privilege, then, is "implicit in [the Constitution's] structure and supported by historical practice[.]" *Franchise Tax Bd. of California v. Hyatt*, 587 U.S. 230, 247–48 (2019) (citing *United States v. Nixon*, 418 U.S. 683, 705–06 (1974)). And because it is a part of executive privilege, the deliberative process privilege is similarly "grounded in the Constitution" and "derive[s] from the separation of powers doctrine[.]" 3 Weinstein's Evidence § 509.21[3]; *see also In re Sealed Case*, 121 F.3d at 737 n.4. (D.C. Cir. 1997) (explaining that "aspects of the privilege . . . have roots in the constitutional separation of powers.").

## 2.

Given its grounding in the separation of powers, it's no wonder that the law ordinarily protects against the disclosure of predecisional, deliberative documents. Start with the normal process. When a party challenges an agency action under the APA, a reviewing court considers the "whole record." 5 U.S.C. § 706. It is "well-settled" that "the whole record" is "the record the agency presents" as the administrative record. *Blue Mountains Biodiversity Project*, 99 F.4th at 444–45 (simplified); *see also Oceana, Inc. v. Ross*, 920 F.3d 855, 865 (D.C. Cir. 2019) ("[O]n APA review, the agency must submit proper certification that the record is complete[.]") (simplified). The scope of discovery is thus ordinarily limited to the administrative record. And

internal agency plans are generally not part of that record. *See Blue Mountains Biodiversity Project*, 99 F.4th at 444.

To get additional discovery, a plaintiff must make "a strong showing of bad faith or improper behavior." *Dep't of Commerce v. New York*, 588 U.S. 752, 781 (2019) (simplified). In other words, extra-record discovery does not occur "absent impropriety or bad faith by the agency." *Blue Mountains Biodiversity Project*, 99 F.4th at 444. A plaintiff bears the burden of establishing bad faith. *Dep't of Commerce*, 588 U.S. at 781. And even when the privilege is overcome, courts have given "different treatment for materials reflecting deliberative or policy-making processes on the one hand, and purely factual, investigative matters on the other." *EPA v. Mink*, 410 U.S. 73, 89 (1973).

As this background shows, courts have demanded restraint when ordering the production of internal Executive Branch materials. As we've said, while the deliberative process privilege is "not absolute," it requires "careful consideration" of the Executive's interests "by the judiciary." *Karnoski v. Trump*, 926 F.3d 1180, 1207 (9th Cir. 2019). Thus, before overcoming the privilege, courts must "giv[e] full consideration to the Executive's Article II prerogatives." *Id.* .

The Supreme Court has also explained how to consider the privilege in a strikingly similar case. *See Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367 (2004). There, as here, the district court ordered production of "everything under the sky" from the Vice President and other senior Government officials about their service on a task force established to give advice and make policy recommendations to the President. *Cheney*, 542 U.S. at 372, 385, 387. The Supreme Court vacated an order denying mandamus, clarifying that

the Judiciary must recognize "the paramount necessity of protecting the Executive Branch from vexatious litigation that might distract it from the energetic performance of its constitutional duties." *Id.* at 382. Lower courts in that case failed to understand that "special considerations control when the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications are implicated." *Id.* at 385. To respect this, ordering discovery of internal Executive Branch documents should be avoided whenever possible and any order must be "narrow" and no broader than reasonably necessary to serve its purpose. *Id.* at 386, 388.

All we need to do is look back six months to see how the Supreme Court requires us to view the "special considerations" in ordering disclosure of the Executive's deliberative documents. *See U.S. Doge Serv. v. Citizens for Resp. and Ethics in Wash.*, 145 S. Ct. 1981, 1982 (2025). "[S]eparation of powers concerns," the Court explained, "counsel judicial deference and restraint in the context of discovery regarding internal Executive Branch communications." *Id.* Far from restrained, the district court there ordered "disclos[ure] of the content of intra–Executive Branch recommendations and whether those recommendations were followed[.]" *Id.* The discovery order was thus "not appropriately tailored." *Id.* On remand, the Supreme Court instructed the D.C. Circuit to "take appropriate action to narrow" the discovery order. *Id.* at 1982. And though "interim orders" aren't "conclusive as to the merits," the Supreme Court has warned that "they inform how [lower] court[s] should exercise [their] equitable discretion in like cases." *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025). We should have followed that admonition here.

**3.**

Return to this case.  The panel majority first erred in viewing the deliberative process privilege overcome without any showing of bad faith or improper motive.  And even if it were overcome, the panel majority erred in not reigning in the district court's overly broad discovery order.

First, the panel majority gave no "special consideration[]" to the Executive Branch's request to protect its internal communication, *Cheney*, 542 U.S. at 385—let alone established the "strong showing of bad faith or improper behavior" necessary for extra-record discovery, *Dep't of Commerce*, 588 U.S. at 781 (simplified).  Instead, the panel majority discounted the government's interests and improperly shifted the burden to prove governmental harm.  The panel majority's only consideration of the separation of powers focused on whether the government proved a "chilling effect on internal Executive Branch deliberations." *See AFGE*, 155 F.4th at 1092–93.  Because *in camera* production of some internal RIF documents hadn't yet produced any "harm[,]" the panel majority concluded that disclosure would not hinder internal agency communication. *Id.*

This is a myopic view of a separation-of-powers injury.  As we've recognized, "[i]t would be impossible to have any frank discussions of legal or policy matters in writing if all such writings were to be subjected to public scrutiny." *United States v. Fernandez*, 231 F.3d 1240, 1246 (9th Cir. 2000) (simplified).  Indeed, the government argues that it "cannot function if officials are worried" that their written "proposals and strategies for future staffing needs or for budget talks with congressional appropriators" "may be shared on a whim, without need, and contrary to law and

settled practice." The panel majority failed to show how this government interest had been overcome here. Just because the government didn't provide evidence of instant harm by the *in camera* production of some RIF plans, that doesn't mean no harm would come to pass. And the panel majority cited no precedent showing that the government is only protected by the privilege if it proves an immediate demonstrable injury.

Next, perhaps sensing the weakness of this position, the panel majority pivoted to claim that the normal rules for APA review do not even apply because of the "sweep[] of actions undertaken by the government" without what it believes is "ordinary process." *AFGE*, 155 F.4th at 1093. Under this view, courts may disregard the settled rules for government discovery whenever they consider disfavored government action "sweep[ing]" or "massive." *Id.* Never mind that the Supreme Court has already held that the Executive Order and OMB/OPM guidance are likely to be "lawful." *Trump*, 145 S. Ct. at 2635. And never mind that the normal channel to challenge RIFs is before the Merit Systems Protection Board and the Federal Circuit. *See AFGE*, 139 F.4th at 1041 (Callahan, J., dissenting) (citing 5 U.S.C. §§ 7701(a), 7703(b)(1); 5 C.F.R. § 351.901). Even on the panel majority's own terms, it's odd to judicially condone "departures from settled principles" in response to other "departures from settled principles." *AFGE*, 155 F.4th at 1093. "Tit" for "tat" is no jurisprudential principle.

And even if the privilege could be overcome here, the district court's discovery order still fails. At the very least, to protect the constitutional structure, federal courts must appropriately narrow discovery orders against the Executive Branch. But the discovery order is too broad twice over. First, the district court ordered production of internal RIF

Plans for agencies that did not even implement a RIF.  The discovery order applies to 21 federal agencies, although at least 13 of those agencies had not yet implemented any RIFs or reorganizations according to Plaintiffs' amended complaint.  Second, the discovery order applies to *unapproved* internal RIF Plans, requiring disclosure of any plan simply *submitted to* OMB and OPM.  So the district court's discovery order applies to RIF plans never implemented or approved by anyone.  Thus, the discovery order fails under its own logic and it is neither "appropriately tailor[ed]" nor "restrained" as the Supreme Court requires. *See U.S. Doge Serv.*, 145 S. Ct. at 1982.

## C.

### Ultra Vires Claim Is No Password For Unlimited Discovery

The panel decision is wrong for another reason: it approves a roadmap for getting around the APA's ordinary discovery limits.  As an alternative to its APA ruling, the panel majority justified the district court's broad extra-record discovery order by invoking Plaintiffs' ultra vires claim.  Because Plaintiffs challenged the RIF Plans "as exceeding unlawful authority and therefore *ultra vires*," the panel majority ruled, without citation, that "[r]eview of an *ultra vires* challenge would not be limited to an administrative record." *AFGE*, 155 F.4th at 1093.  The panel majority thus endorsed a fishing expedition for Executive Branch materials by mere invocation of an ultra vires claim.

But "ultra vires" is not a magic word for getting around the APA's limitations. *See Blue Mountains Biodiversity Project*, 99 F.4th at 444–45 (articulating the settled APA discovery limits).  In fact, the Supreme Court has recently warned that "ultra vires review could become an easy end-

run around" normal judicial review statutes like the APA. *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025). To avoid this possibility, the Supreme Court has "strictly limited nonstatutory ultra vires review," narrowing it to "only" those times an agency has acted "contrary to a *specific prohibition* in a statute" and when statutory review schemes like the APA do not provide "a meaningful and adequate opportunity for judicial review." *Id.* (simplified); *see also Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964) (describing the limits of post-APA ultra vires review as "painstakingly delineated procedural boundaries"). In this way, an ultra vires claim "is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Nuclear Regul. Comm'n*, 605 U.S. at 681–82.

This case shows why the Supreme Court's fear is well-founded. Plaintiffs' ultra vires claim is nearly identical to their APA claim that OMB, OPM, and DOGE acted "in excess of statutory . . . authority" in violation of 5 U.S.C. § 706(2)(C). Plaintiffs do not allege any specific statutory prohibition in their ultra vires claim that would qualify for the "strictly limited role" ultra vires review plays in a post-APA world and they haven't established why the APA doesn't offer meaningful judicial review. And yet, Plaintiffs now get extra-record discovery of internal Executive Branch planning documents courtesy of the panel majority.

On the panel majority's reasoning, whenever a party wants extra-record discovery, it could attach an ultra vires claim to its complaint in addition to the APA claims. Want to avoid the APA's discovery limits? No worries. Just add the words "ultra vires" to your complaint and, voilà, you get extra-record discovery without needing to establish an exception to the normal APA discovery limits. By turning a Hail Mary pass into a screen pass, the majority approves "an

easy end-run around" the APA. *Nuclear Regul. Comm'n*, 605 U.S. at 681. We should have taken this case en banc to ensure that ultra vires challenges are not an exception to the APA's discovery limits.

## III.

Our respect for the Constitution demands that we treat the internal deliberative documents of a co-equal branch of government with appropriate care. We don't cavalierly intrude on those communications because we disfavor the government's actions or believe it could have managed things differently. Because the panel majority's decision ordered the production of internal government plans, proposals, and recommendations without special consideration for the separation of powers, I respectfully dissent.